Alex S. Madar, Esq. (SBN: 319745)
alex@madarlaw.net
**MADAR LAW CORPORATION**
630 1st Ave, Ste 219
San Diego, CA 92101
Telephone: (858) 299-5879

Michael A. VanGalio, Esq. (SBN: 314675)
michael@vangaliolaw.com
**VANGALIO LAW CORP**
7710 Hazard Center Dr. Ste E401
San Diego, CA 92108
Telephone: (805) 720-3938

Andrea R. Gold (*admitted pro hac vice*)
agold@tzlegal.com
**TYCKO & ZAVAREEI LLP**
2000 Pennsylvania Avenue, Northwest, Suite 1010
Washington, District of Columbia 20006
Telephone: (202) 973-0900

Frank A. Bartela (*admitted pro hac vice*)
fbartela@tzlegal.com
Patrick J. Brickman (*admitted pro hac vice*)
pbrickman@tzlegal.com
**TYCKO & ZAVAREEI LLP**
2515 Jay Ave, Ste First Floor
Cleveland, OH 44113
Telephone: (216) 423-6599

*Counsel for Plaintiffs and the Putative Class*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**KYLE DICKSON, WILLIAM WAGNER, AND KRISTINE VILLANUEVA**, individually and on behalf of all others similarly situated,

Plaintiffs,

vs.

CSAA Insurance Exchange, Mobilitas Insurance Company of Arizona, and DOES 1-100,

Defendants.

Case No.: 3:25-cv-09836-TLT

Judge: Trina L. Thompson

**FIRST AMENDED CLASS ACTION COMPLAINT**

1. **DECLARATORY RELIEF**
2. **VIOLATIONS OF CAL. BUS. & PROF. CODE §§ 17200, ET SEQ.**
3. **BREACH OF CONTRACT**
4. **BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**
5. **INTENTIONAL MISREPRESENTATION**

**DEMAND FOR JURY TRIAL**

Plaintiffs KYLE DICKSON, WILLIAM WAGNER, and KRISTINE VILLANUEVA (collectively "Plaintiffs"), individually and on behalf of the proposed Class, bring the following first

amended class action complaint against CSAA Insurance Exchange ("CSAA"), Mobilitas Insurance Company of Arizona ("Mobilitas"), and DOES 1-100 (collectively "Defendants").

# TABLE OF CONTENTS

I. INTRODUCTION……………………………………………...……………………5

II. JURISDICTION & VENUE……………………………………………………………8

III. PARTIES…………………………………………………………………...……..9

IV. CSAA'S LIABILITY BASED ON ALTER EGO, DIRECT PARTICIPATION, AND AGENCY……………………………………………………………………..…..11

V. FACTUAL BACKGROUND……………………………………………………………13

A. California Law Requires and Sets Minimum Coverage Levels in All Insurance Contracts…………………………………………………..…………...13

B. Defendants' Failure to Meet These Minimum Coverage Requirements………...….16

C. Lyft's Role as Defendants' Designated Agent for the Limited Purpose of Collection of Premiums ……………………………………………………………...20

D. The Mechanics of the Illegal Scheme: How the Mileage-Based Premium and Lyft's Disclosures Establish Ascertainable Class-Wide Restitution ……….……………...23

E. The Heightened Risk of an Unregulated, Non-Admitted Insurer …………………..26

F. Plaintiff Dickson's Experience………………………………………………...26

G. Plaintiff Wagner's Experience…………………………………………...….27

H. Plaintiff Villanueva's Experience……………………………………..….28

VI. CLASS ACTION ALLEGATIONS…………………………………………………...29

VII. CAUSES OF ACTION………………………………………………………………...35

A. First Cause of Action – Declaratory Relief……………………………………..35

B. Second Cause of Action - Violations of Cal. Bus. & Prof. Code §§ 17200, Et Seq…....38

C. Third Cause of Action – Breach of Contract…………………………………….....43

D. Fourth Cause of Action – Breach of the Implied Covenant of Good Faith and Fair Dealing……………………………………………………………………………..46

E. Fifth Cause of Action – Intentional Misrepresentation……………………..……..48

VIII. PRAYER FOR RELIEF……………………………………………………...…..49

IX. DEMAND FOR JURY TRIAL........................................................................51

## INTRODUCTION

1. This class action challenges a systemic and unlawful insurance scheme conceived and implemented by both Defendants CSAA Insurance Exchange and Mobilitas Insurance Company of Arizona (collectively, "CSAA Defendants"). The scheme is predicated on a classic bait-and-switch: charging millions of California rideshare users for a robust, legally compliant insurance safety net, while providing a diminished insurance policy plagued with unlawful provisions.

2. California law mandates that passengers[1] of Transportation Network Companies ("TNCs") like Lyft, Inc. ("Lyft") be provided a *primary* policy of Uninsured/Underinsured Motorist ("UM/UIM") coverage.

3. In order to save money by reducing payout risk, Defendants are knowingly only providing *secondary* (also known as excess) UM/UIM coverage.

4. The State of California's requirement that TNC passengers be provided mandatory primary UM/UIM insurance is a cornerstone of the state's public safety framework for the TNC industry and system, intended to provide a seamless and immediate source of compensation for all occupants of a rideshare vehicle.

5. Instead of heeding the State of California's clear regulatory warning about the importance of UM/UIM coverage for TNC passengers and eventual mandate to address critical safety shortcomings in the TNC system[2], Defendants chose to exacerbate the crisis by issuing, and charging Plaintiffs and the Class for, an insurance product that unequivocally failed to meet the specific laws designed to address the issue. These premium payments, collected on every ride by Defendants' agent Lyft, form the consideration for a direct insurance contract between Defendants and their passenger-

---

[1] The terms "Passengers", "Riders", and "Occupants" are used interchangeably throughout.

[2] This unlawful scheme was implemented despite the fact that California's own expert regulators—the Department of Insurance ("CDI") and the Public Utilities Commission ("CPUC")—had already completed a formal, data-driven study at the end of 2017 confirming that Uninsured/Underinsured Motorist (UM/UIM) coverage is an "essential component" of TNC insurance precisely because it covers the most severe accidents. Cal. Dep't of Ins. & Cal. Pub. Utils. Comm'n, Joint Study of Transp. Network Co. (TNC) Ins. Coverage Requirements in Cal. at 5, 30 tbl.3.10 (Dec. 31, 2017) [hereinafter 2017 CDI/CPUC Study]. Accessible at: https://www.insurance.ca.gov/0400-news/0200-studies-reports/upload/TNC_REPORT_AS_OF_010518.pdf. More alarmingly, the regulators' data revealed that, even under the then-existing legal framework, the TNC insurance system was already failing to compensate victims of uninsured or underinsured motorists for nearly a quarter (23.58%) of their total financial losses.[2] *Id.* at 30 tbl.3.10.

insureds.

6. Defendants engineered a UM/UIM product with provisions that systematically violate California law. Specifically, these illegal provisions and Defendants' implementation thereof render its UM/UIM coverage secondary, not primary as is required by law.

7. Defendants also implement these illegal provisions by imposing preconditions on coverage, specifically by refusing to process a claim until the insured first seeks and obtains a formal denial of coverage from their personal auto insurer.

8. This scheme allows Defendant CSAA to reduce its own risk exposure in contravention of California law at the direct expense of Plaintiffs and other passengers who fund the unlawful policy through additional fees as part of their Lyft fares.

9. Upon information and belief, the premium payments made by Plaintiffs and the Class to Lyft for what was represented to be a UM/UIM policy with fully legally compliant provisions were then passed from Lyft directly to Defendants.

10. Defendants' scheme substantially reduces the value of what Plaintiffs and the putative class members expected and received in exchange for these premiums.

11. The financial harm to Defendants' insureds was not an incidental byproduct of this scheme; it was its direct and intended consequence. Defendants owe their insureds a duty of good faith and fair dealing.

12. Instead of honoring this duty, Defendants conceived a scheme predicated on profiting from a bait-and-switch: using Lyft to collect and pass through to Defendants premiums paid by their insureds for a legally compliant insurance product while knowingly providing a product with illegal provisions.

13. The profit margin for the Defendants was generated by overcharging Lyft's customers and Defendants' passenger-insureds at the point of sale. Lyft's customers and Defendants' passenger-insureds paid for a legally compliant insurance product that functions as a primary safety net. Instead, they received an insurance policy riddled with illegal exclusions—a policy designed not to pay, but to evade.

14. The substantial portion of passenger fares specifically allocated to this mandatory insurance was thus lost money, paid in exchange for a product that was materially and fundamentally different from, and worth less than, what Defendants' passenger-insureds paid for and expected, and what the law requires.

15. The risk to consumers of Defendants' illegal scheme is magnified by Defendants' corporate and regulatory structure. As disclosed on the policy itself, Mobilitas operates as a non-admitted surplus lines insurer in California, meaning it is not licensed by the State of California, is not subject to California's financial solvency regulations, and—most critically—is not a member of the California Insurance Guarantee Association (CIGA). This leaves consumers, including Plaintiffs and the Class, with no state-backed safety net in the event of Mobilitas' insolvency. A business model predicated on a systemic, illegal scheme inherently creates a heightened risk of financial instability, making any legal remedy for money damages potentially worthless. This renders equitable remedies, such as a constructive trust over the wrongfully obtained premiums, the only adequate means to secure and restore the funds taken from the Class.

16. Defendants' practice violates California Insurance Code § 11580.2, and Public Utilities Code § 5433. By designing and selling a significantly reduced-value insurance product with illegal provisions directly to their passenger-insureds, Defendants have also fundamentally breached the direct insurance contract, tortiously violated the implied covenant of good faith and fair dealing, and engaged in an unlawful, unfair, and fraudulent business practice.

17. Plaintiffs, on behalf of a broad class of California Lyft customers and a nested subclass of those customers who also purchased their own rides, seek to hold Defendants accountable for this scheme. They seek a judicial declaration that portions of Defendants' insurance policy, as well as its practices, are unlawful, a permanent injunction to compel Defendants to comply with California law, and the recovery of all available monetary relief, including full restitution for the broader class of Lyft customers, and contract, tort, and punitive damages for the subclass of direct passenger-insureds.

## JURISDICTION AND VENUE

18. This Court has original jurisdiction over this action under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2) as to the named Plaintiffs and every member of the Class because the Class contains more than 100 members, the aggregate amount in controversy exceeds $5,000,000, and members of the Class reside in California and are therefore diverse from Defendant Mobilitas, a corporation registered in Arizona. The Court also has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

19. The Court has personal jurisdiction over Defendants because both Defendants have significant minimum contacts with California, and/or they otherwise intentionally availed themselves of the laws and markets of California through marketing, advertising, and the issuance of insurance policies in California, including the policy at-issue. The claims asserted herein also arise from Defendants' contacts with California. This Court's exercise of jurisdiction over Defendants is permissible under traditional notions of fair play and substantial justice.

20. Venue is proper in the United States District Court for the Northern District of California pursuant to 28 U.S.C. § 1391(b)(1) because Plaintiffs Dickson and Wagner reside within this District, both Defendants are subject to personal jurisdiction in this District; both Defendants regularly conduct substantial business in this District; both Defendants maintain physical offices within this District; Defendant CSAA maintains its corporate headquarters in this District; and many Class Members reside in this District.

21. Venue is also proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiffs' and the Putative Class's claims occurred within this District, including, but not limited to, the creation of the insurance policies at issue, the creation and implementation of the specific insurance claim handling procedures which evidence the illegal and unlawful nature of Defendants' insurance policies, and the payment by Plaintiff Dickson and Wagner of inflated passenger fares and fees in connection with the Defendants' unlawful insurance coverage.

## PARTIES

**Plaintiff Kyle Dickson**

22. Plaintiff Kyle Dickson ("Plaintiff Dickson") is, and at all times mentioned herein was, a resident of the County of Contra Costa, State of California. Plaintiff Dickson purchased and was the occupant of rideshare services provided by Lyft, Inc., for which he paid fares and fees. As such, Plaintiff Dickson is a member of the proposed California Purchaser Class and the California Insured Subclass. Under the plain language of Defendants' California Uninsured Motorists Coverage – Bodily Injury policy endorsement, which expressly defines an "insured" to include anyone "'occupying' a covered 'auto'," Plaintiff Dickson was a direct insured under Defendants' TNC policy.

**Plaintiff William Wagner**

23. Plaintiff William Wagner ("Plaintiff Wagner") is, and at all times mentioned herein was, a resident of the County of Sonoma, State of California. Plaintiff Wagner purchased and was the occupant of rideshare services provided by Lyft, Inc., for which he paid fares and fees. As such, Plaintiff Wagner is a member of the proposed California Purchaser Class and the California Insured Subclass. Under the plain language of Defendants' California Uninsured Motorists Coverage – Bodily Injury policy endorsement, which expressly defines an "insured" to include anyone "'occupying' a covered 'auto'," Plaintiff Wagner was a direct insured under Defendants' TNC policy.

**Plaintiff Kristine Villanueva**

24. Plaintiff Kristine Villanueva ("Plaintiff Villanueva") is, and at all times mentioned herein was, a resident of the County of San Diego, State of California. Plaintiff Villanueva purchased and was the occupant of rideshare services provided by Lyft, Inc., for which she paid fares and fees. As such, Plaintiff Villanueva is a member of the proposed California Purchaser Class and the California Insured Subclass. Under the plain language of Defendants' California Uninsured Motorists Coverage – Bodily Injury policy endorsement, which expressly defines an "insured" to include anyone "'occupying' a covered 'auto'," Plaintiff Villanueva was a direct insured under Defendants' TNC policy.

**Defendant CSAA Insurance Exchange**

25. Defendant CSAA Insurance Exchange ("CSAA"), acting as the parent, principal, and architect of the scheme implemented alongside its subsidiary Mobilitas, is an insurance company incorporated in California offering automobile, homeowners, and other lines of insurance in 23 states and the District of Columbia.

26. Defendant CSAA has its principal place of business and headquarters located at 3055 Oak Road, Walnut Creek, CA 94597.

27. Plaintiffs allege that, at all times relevant herein, Defendant CSAA conducted business in the State of California and in the County of Contra Costa, and within this judicial district.

**Defendant Mobilitas Insurance Company of Arizona**

28. Defendant Mobilitas Insurance Company of Arizona ("Mobilitas") is a commercial insurance company incorporated in Arizona and is a wholly owned subsidiary of Defendant CSAA.

29. Defendant Mobilitas has its principal place of business and headquarters located at 5353 West Bell Road, Glendale, AZ 85308. Defendant Mobilitas also maintains a California office located at 3055 Oak Road, Walnut Creek, CA 94597, which is the headquarters of CSAA, and lists a mailing address with the California Department of Insurance of P.O. Box 23392, Oakland, CA 94623.[3]

30. Beginning on October 1, 2022, and at all times relevant to this action, Defendant Mobilitas issued a commercial insurance policy providing coverage to Lyft's occupants throughout California. Defendant Mobilitas issued, and continues to issue, this policy as a non-admitted surplus lines carrier, and thus is not subject to regulation by the California Department of Insurance as it relates to this policy.

31. Plaintiffs allege that, at all times relevant herein, Defendant Mobilitas conducted business in the State of California and in the County of Contra Costa, and within this judicial district.

---

[3] *See* https://mobilitasinsurance.com/privacy/ (Mobilitas Insurance Company Privacy Policy Version Dated July 14, 2025 - last accessed November 13, 2025). *See also* https://interactive.web.insurance.ca.gov/companyprofile/companyprofile?event=companyProfile&doFunction=getCompanyProfile&eid=116198 (California Department of Insurance Company Profile - last accessed November 13, 2025).

32. Throughout the entirety of the applicable policy period wherein Mobilitas was the named insurer to the subject policy of insurance issued to Lyft riders, Mobilitas sent 100% of the premiums it received under the Lyft policy directly to CSAA. In turn, CSAA accepted and assumed 100% of the covered risks under the written policy.[4]

**DOES 1-100**

33. The true names and capacities of Defendants named herein as DOES 1 through 100, inclusive, are unknown to Plaintiffs at this time. Plaintiffs will amend this Complaint to allege their true names and capacities when they have been ascertained. Plaintiffs are informed and believe that each of the fictitiously named Defendants is responsible in some manner for the occurrences herein alleged.

## CSAA'S LIABILITY BASED ON ALTER EGO, DIRECT PARTICIPATION, AND AGENCY

34. Defendant CSAA is liable for the unlawful conduct, breaches, and resulting damages alleged herein under at least three independent legal theories. First, as detailed below, Defendant Mobilitas has acted as the agent, instrumentality, and alter ego of Defendant CSAA, such that the corporate form should be disregarded. Second, CSAA is liable as a direct participant in the tortious conduct, as it conceived, directed, and implemented the unlawful insurance scheme. Third, CSAA is vicariously liable as the principal for the acts of its agent, Mobilitas, which were committed within the scope of the agency relationship.

***Alter Ego Liability***

35. At all times relevant herein, and as further detailed below, upon information and belief, CSAA and Mobilitas have such a unity of interest and ownership that their separate corporate personalities no longer in fact exist. Adherence to the fiction of separate corporate existence would sanction a fraud, promote injustice, and permit an abuse of the corporate privilege by shielding CSAA from liability for the unlawful scheme it designed and profits from. This unity of interest is evidenced

---

[4] *See* Report of Examination of the CSAA Insurance Exchange as of December 31, 2023 (available at https://www.insurance.ca.gov/0250-insurers/0300-insurers/0400-reports-examination/upload/CSAA-Insurance-Exchange-2023-Report-of-Examination.pdf) (last accessed February 26, 2026).

by, among other things:

A. An inter-company reinsurance agreement, wherein Mobilitas sends 100% of its earned premium directly to CSAA, and, in return, CSAA accepts and assumes 100% of Mobilitas' covered risks. As a result, Mobilitas lacks any independent risk-bearing capacity for the handling of claims under Defendants' commercial insurance policy.

B. As Mobilitas sends all insurance premiums to CSAA, Mobilitas is grossly undercapitalized in light of its vast risk exposure in the California TNC insurance market.

C. Mobilitas and CSAA share nearly every facet of their corporate infrastructures, including corporate offices; the use of CSAA employees to handle Mobilitas claims; the use of CSAA-controlled email servers (csaa.com) for Mobilitas's claims-related communications; and the sharing of executive officers (pursuant to the most recent official filings with the California Secretary of State, CSAA and Mobilitas share the same Chief Executive Officer (Michael Zukerman), Chief Financial Officer (Andrea Hecht), and Secretary (Katherine Evans)).

D. CSAA oversees and directs both the overall business strategy and the day-to-day operations of Mobilitas.

***<u>Direct Participation Liability</u>***

36. CSAA actively participated, and continues to participate, in the tortious conduct. The unlawful insurance scheme was conceived, directed, and implemented by CSAA for its own corporate benefit. Specifically, CSAA directly architected the unfair and fraudulent business model; and directly participated in the intentional misrepresentations by engineering the unlawful insurance product, directing the issuance of policies that misrepresented the scope of coverage, and exercising operational control over all aspects of the administration of the policy, including claims handling. CSAA committed and continues to commit its own wrongful acts as both the mastermind of the scheme and primary enforcer of the insurance policy.

37. At all relevant times, Mobilitas acted as the agent of its principal, CSAA, in the business of providing TNC insurance. CSAA manifested its consent for Mobilitas to act on its behalf

and subject to its control by creating Mobilitas for this express purpose, installing its own executives as the officers of Mobilitas, directing Mobilitas's business strategy, and exercising operational control over key functions, including claims handling. All of the unlawful acts and omissions of Mobilitas alleged herein were committed within the scope of this agency relationship and in furtherance of CSAA's business objectives.

## FACTUAL BACKGROUND

### A. California Law Requires and Sets Minimum Coverage Levels in All Insurance Contracts

38. Under California law, "any ambiguity or uncertainty" in an insurance policy must be "construed strictly against the insurer and most liberally in favor of the insured."[5] California law additionally requires "every insurance policy will thus be read so as to provide the *minimum* coverage required by law even if the policy fails to do so."[6]

39. Insurance coverage for injuries caused by either an uninsured motorist or an underinsured motorist (together "UM/UIM coverage") is governed by the Uninsured Motorist Act, codified at Cal. Ins. Code § 11580.2 (the "UM Statute").

40. Under California law, this statute – which is designed to protect injured individuals from suffering for losses caused by another's financial irresponsibility – should be liberally construed in favor of coverage.[7]

#### i. Specific Legal Requirements for UM/UIM Policies Covering TNC Passengers

41. As to UM/UIM policies covering TNC riders such as Plaintiffs and the members of

---

[5] *Akkerman v. Grange Ins. Ass'n*, 525 F. Supp. 3d 1122, 1125 (E.D. Cal. 2021) (citing *Jarrett v. Allstate Ins. Co.*, 209 Cal. App. 2d 804 (1962) (citing *N.Y. Life Ins. Co. v. Hollender*, 38 Cal. 2d 73, 237 P.2d 510 (1951)).

[6] *Akkerman* at 1125 (citing *Utah Prop. & Cas. Ins. Etc. Ass'n. v. United Servs. Auto. Ass'n*., 230 Cal.App.3d 1010, 1018 (Ct. App. 1991) (citing *Luberman's Mutual Casualty Co. v. Wyman*, 64 Cal.App.3d 252, 257, 134 Cal. Rptr. 318 (Ct. App. 1976)).

[7] *See*, *e.g*., *Oanh Thi Pham v. Allstate Ins. Co.*, 206 Cal. App. 3d 1193, 1198 (1988) (the Statute is "remedial in nature"; by mandating UM/UIM coverage, "the Legislature attempted to broaden the protection ... against negligent and financially irresponsible motorists"; and as a result "[t]he legislation should be liberally construed to effect this goal." (citing/quoting *Inter-Insurance Exchange v. Lopez*, 238 Cal.App.2d 441, 443 (1965); *Firemen's Ins. Co. v. Diskin* (1967) 255 Cal.App.2d 502; *Security Nat. Ins. Co. v. Hand* (1973) 31 Cal.App.3d 227, 233) (internal marks and citations omitted). *See also*, e.g., 11 CR3d 158, 162; *Mercury Ins. Co. v. Enterprise Rent-A-Car Co. of Los Angeles* (2000) 80 CA 4th 41, 48, 95 CR2d 222, 227 ("In interpreting the UM statutes, courts temper the general rule of strict construction of statutes").

the putative class, California Public Utilities Code § 5433(b) mandates and has always mandated that for any accident occurring while a passenger is being transported in a TNC vehicle, Defendants' insurance "**shall be primary**."[8]

42. To enforce this primacy and eliminate any potential for insurer evasion, the California Legislature enacted Public Utilities Code § 5433(d), which contains an unambiguous prohibition against the exact claims-handling tactics employed by Defendants:

> "Coverage under a transportation network company insurance policy shall not be dependent on a personal automobile insurance policy first denying a claim**,** nor shall a personal automobile insurance policy be required to first deny a claim."

This provision prevents insurers such as Defendants from unlawfully deferring their coverage responsibility to the claimant's personal insurer.

### ii. The Legislature's Affirmation of Primary Coverage for Liability and UM/UIM

43. The statutory mandate that TNC insurance "shall be primary" is unambiguous.

44. The California Legislature itself has, on multiple occasions, formally and publicly affirmed this principle. In a September 9, 2025 summary prepared by the Senate Committee on Insurance in review of proposed Senate Bill 371[9], the Committee explicitly described the state of "EXISTING LAW" in two distinct parts:

> **"Existing law requires TNC insurance to serve as the primary insurance for the duration of a TNC ride and requires this insurance to provide the following coverage amounts:**
>
> **a. $1 million for death, personal injury, and property damage**
> **b. $1 million in underinsured and uninsured motorist coverage."**

45. This exact statement of law was also issued *verbatim* by the Assembly Committee on Energy, Utilities, and Communications on April 21, 2025; the Senate Committee on Transportation

---

[8] As of January 1, 2026, the language of California Public Utilities Code § 5433 has been modified. Despite the modification of language, § 5433 has *always* mandated that TNC UM/UIM coverage be primary. See Par. 47 - 49, *infra*.

[9] As of the date of this filing, SB 371 has been signed into law and, effective Jan 1, 2026, lowered the minimum coverage for UM/UIM carried by TNC insurers in Period 3 from $1,000,000 to $60,000 per person, and $300,000 per incident.

on April 28, 2025; the Assembly Committee on Communications and Conveyance on July 16, 2025; and the Assembly Committee on Insurance on July 16, 2025[10].

46. These authoritative, itemized statements from the legislative bodies responsible for insurance oversight serve as dispositive confirmation of the Legislature's intent – Defendants were and are required to provide rideshare passengers with policies that provide primary UI/UIM coverage.

47. In providing only secondary coverage, Defendants directly and intentionally violating California law to the detriment of Plaintiffs and the putative class members.

### iii. The TNC Insurance Statutes Provide the Exclusive and Controlling Law by Deliberately Overriding the General Insurance Framework

48. Under California auto insurance law, the term "primary" is a legal term of art. The default statutory scheme for resolving priority of coverage disputes between multiple auto insurance policies is set forth in the framework of Insurance Code § 11580.9.

49. Recognizing that these priority rules can lead to significant disputes and delays in payment to injured victims, the Legislature made a deliberate public policy decision to create a special, simplified rule for the TNC context.

50. To leave no doubt as to a TNC insurer's obligations, the Legislature enacted Public Utilities Code § 5443 as a statutory "supremacy clause," which explicitly **overrides** the complex default rules of the Insurance Code. The statute states:

> Notwithstanding Section 11580.9 of the Insurance Code, or any other law affecting whether one or more policies of insurance that may apply with respect to an occurrence is primary or excess, this article determines the obligations under insurance policies issued to transportation network companies…

51. The legal effect of this statute is to create a hermetically sealed legal framework. The Legislature deliberately replaced the complex waterfall of § 11580.9 with a simple, absolute, and non-negotiable command for TNC insurance, set forth in Public Utilities Code § 5433(b): the TNC's insurance "**shall be primary**."

---

[10] Available at: https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=202520260SB371 (last accessed March 13, 2026).

52. Defendants are therefore statutorily prohibited from looking to an insured passenger's personal auto policy (the very issue governed by the overridden § 11580.9), or any other benefits policy, to subordinate or excuse its own primary duties. The TNC article alone controls.

**B. Defendants' Failure to Meet These Minimum Coverage Requirements**

53. In the present matter, as alleged herein, Defendants failed to meet these minimum coverage requirements.

54. In contravention of both California Public Utilities Code § 5433 and public policy, both of which mandate that UM/UIM coverage afforded to TNC passengers be *primary*, Defendants' insurance policy terms and claims practices nefariously and unequivocally misrepresent Defendants' coverage obligations under California law as *secondary* (also known as an "excess" policy) to the Lyft passenger's personal policy.

**i. Defendants' Unlawful Policy Provisions and Implementation of Their Scheme**

55. Every single passenger-insured, from the moment of payment to Defendants' agent Lyft, is harmed by being deprived of the primary benefit of their contract: the financial security the law required Defendants to provide but which they didn't.

56. This reduced value and Plaintiffs' and the putative class members' harm is evidenced by the illegal "excess clause" in Defendants' policies, as well as the procedures Defendants use to implement it.[11]

57. ***The Unlawful "Reduction" Clause*:** Mobilitas's California Uninsured Motorists Coverage – Bodily Injury policy endorsement contains an explicit "excess" clause that directly violates the statutory command that TNC insurance "shall be primary." The clause illegally purports to reduce Mobilitas's own primary policy limits based on the existence of a passenger's personal insurance policy. Specifically, Section D – Limits of Insurance, Paragraph 4 states:

"If Uninsured Motorists Coverage available for anyone 'occupying' the covered 'auto'

---

[11] It is important to note that this action does not seek recovery pursuant to any Plaintiff's or putative class member's claims experience. The allegations of Defendants' policy language and claims procedures simply evidences that Defendants' product is worth less than what the law required and what Plaintiffs and the putative class members expected and paid for.

provides less than the Limit of Insurance for this coverage shown on the Declarations of this policy, **then our Limit of Insurance for Uninsured Motorists Coverage will be reduced by the amount of that other insurance**, including any deductibles or self-insured amounts." (emphasis added).

58. This reduction mechanism is the functional equivalent of an excess clause and is tailored to specifically align with California's excess UM/UIM "offset" and non-stacking rules. The policy pays second, and only provides the differential amount of coverage, reinforcing its secondary status.

59. ***The Unlawful "Other Insurance" Clause*:** Mobilitas's California Uninsured Motorists Coverage – Bodily Injury policy endorsement similarly contains a detailed "Other Insurance" clause which eliminates any possibility the coverage could be construed as providing primary UM/UIM. Specifically, Section E – Changes in Conditions, Paragraph 4 states:

"4. **Other Insurance** in the Business Auto Coverage Form is replaced by the following:

a. If there is Uninsured Motorists Coverage available to anyone "occupying" the covered "auto" which provides at least the Limit of Insurance for Uninsured Motorists Coverage shown on the Declarations of this policy, then this coverage shall not apply.
b. If there is Uninsured Motorists Coverage available to anyone "occupying" the covered "auto" which provides less than the Limit of Insurance for Uninsured Motorists Coverage shown on the Declarations of this policy, then this policy shall provide coverage on an excess basis.
c. If there is no other valid and collectible Uninsured Motorists Coverage for anyone "occupying" the covered "auto", then this policy shall provide coverage on a primary basis.
d. The maximum recovery under all Coverage Forms or policies combined may equal but not exceed the highest applicable limit for any one vehicle under any Coverage Form or policy providing coverage on either a primary or excess basis. Our share is the proportion that our Limit of Insurance bears to the total of all applicable limits of insurance covering on the same level of priority."

60. ***The Unlawful Imposition of Preconditions:*** In service of their efforts to avoid their primary coverage obligations, Defendants have consistently enforced these illegal policy terms by refusing to process a claim until the insured first seeks and obtains a formal denial of coverage from their personal auto insurer, contrary to the mandates of California law.

61. These practices are the direct and intended result of the illegal policy provisions and confirm that the insurance product funded by Plaintiffs and the Class was, from its inception,

fraudulent, and provided less coverage than is required by law and what Plaintiffs and the members of the putative class expected in exchange for their premiums.

62. This scheme has resulted in the transfer of substantial UM/UIM claim and insuring risk from Mobilitas to the passenger's personal insurer, rendering the UM/UIM policies challenged herein worth significantly less than what Plaintiffs and the putative class members paid for and expected.

63. Plaintiffs and members of the putative class are left having paid valuable consideration for a product worth less than what the law requires and what they expected.

64. This illegal scheme harms Plaintiffs and the putative class members who pay policy premiums for this illegally watered-down UM/UIM coverage through mandated charges.

65. Importantly, these premiums are calculated by a composite mileage rate set by Defendants.[12]

66. Because Plaintiffs and the putative class members funded these policies containing illegal provisions, the scheme was necessarily predicated on charging Defendants' passenger-insureds for a legally compliant product while delivering a product with key unlawful provisions.

67. The profit margin for Defendants was thus generated by a fraudulent scheme predicated on collecting premiums from Plaintiffs and the putative class members in exchange for a product worth less than what the law required and consumers expected.

### ii. Additional Illegalities in Defendants' UM/UIM Policies

68. Beyond the illegality of the secondary/excess illegality and the "imposition of preconditions" illegality, Defendants' policies also contain additional myriad illegalities. While these apply to driver insureds under Defendants' UM/UIM policies and not Plaintiffs' and the putative classes of passenger-insureds, Plaintiffs include discussion of them here to highlight and evidence Defendants' approach to risk-management: impose self-serving and illegal terms that reduce their

[12] *See* California Senate Committee on Insurance Analysis of SB 371 (September 2, 2025) at https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=202520260SB371 (stating Lyft has calculated that riders in California pay up to $6 per ride in insurance costs) (last accessed November 13, 2025).

own risk and coverage, and therefore value of the product, to their insureds.

69. These additional illegalities include provisions that violate the "all sums" mandate of California Insurance Code § 11580.2, as well as their egregious treatment of the Occupation Accident Insurance ("OAI") statutory and regulatory scheme as passed by Proposition 22.

70. ***The "All Sums" Mandate of the Insurance Code*****:** Separate from the primacy requirement, California Insurance Code § 11580.2 mandates that all UM/UIM policies provide coverage for **"all sums which [the insured] shall be legally entitled to recover as damages"** from an at-fault uninsured or underinsured motorist. This includes, without limitation, both economic damages (such as past and future medical expenses and lost wages) and non-economic damages (such as pain and suffering). Any policy provision that unilaterally excludes a category of legally recoverable damages is void as against public policy and unenforceable.

71. ***Defendants' Unlawful Weaponization of the OAI Benefit*****:** The statutory framework governing OAI coverage is clear: Business and Professions Code § 5433 mandates only that a TNC "carries, provides, or otherwise makes available" OAI coverage. This language confers a right of access to the driver, not a mandate of use. A driver retains the absolute right to seek recovery for their injuries directly from the primary UM/UIM carrier under California tort law without ever making a claim on the optional OAI policy.

72. Despite the optional nature of this benefit, Defendants have unlawfully weaponized it. They have coercively transformed a benefit that was merely "made available" into a **mandatory precondition** for receiving any economic damages under the primary UM/UIM policy.

73. Despite clear statutory limitation, Defendants have a uniform policy and practice of violating BPC § 7455(e). They interpret their own unlawful policy language—"entitled to receive payment"—to mean that the mere *eligibility* for OAI benefits extinguishes Defendants' duty to pay for any economic damages. This illegal interpretation transforms a narrowly permitted, end-of-claim offset for amounts provided into a total, front-end exclusion for all amounts merely available, thereby manufacturing a systematic and unlawful coverage gap at the direct expense of their insureds, and subverting the fundamental purposes of the insurance policy: to provide legally enforceable financial

security to its insureds. These practices violate the clear mandate of Proposition 22, the implementing and interpreting regulations promulgated by the California Department of Insurance, and a common sense reading of the statutory scheme.[13]

74. Importantly, these other illegalities shift the underwriting cost-benefit of Defendants' products in Defendants' economic favor, as well as provide further evidence of Defendants' profits over coverage practices.

75. An insurer's primary duty of good faith is to provide the benefit of the bargain—a legally enforceable promise of security. By designing a UM/UIM product with core provisions governing priority and scope of coverage being illegal, Defendants tortiously breached their duty of good faith at the inception of the contract. They knowingly sold an insurance policy and promise that contained provisions that were void as against public policy. As a result, every California passenger-insured who paid for a legally compliant safety net received a significantly diminished promise in return, constituting a failure of consideration and a profound act of bad faith.

### C. Lyft's Role as Defendants' Designated Agent for the Limited Purpose of Collection of Premiums

76. The direct contractual and quasi-fiduciary relationship between Defendants on one hand, and Plaintiffs and the California Insured Subclass on the other, was facilitated by Lyft.

77. In this specific and unique commercial arrangement, Lyft did not act merely as an independent purchaser of a commercial insurance policy. Rather, Lyft acted as the designated agent for its principals, CSAA and Mobilitas, for the limited and specific purpose of acting as the exclusive collection agent for the premium component of the passenger fares that funded their policy.

78. This limited agency relationship arises from Defendants' right of control over the premiums charged to Plaintiffs and the putative class members and the legal doctrine of ratification.

79. ***Designation as Intermediary*:** Upon information and belief, Defendants manifested

---

[13] Cal. Dep't of Ins., Notice re: Implementation of Insurance Provisions of Proposition 22 (Feb. 3, 2021) (https://www.insurance.ca.gov/0250-insurers/0300-insurers/0200-bulletins/bulletin-notices-commiss-opinion/upload/Notice-Implementation-of-Insurance-Provisions-of-Proposition-22.pdf) (last accessed November 13, 2025).

their consent for Lyft to act on their behalf by designing a specialized insurance product with a funding mechanism that would be delivered through the Lyft platform. This was not a generic commercial auto policy; it was a Defendant-authored product built around a Defendant-calculated "Composite Rate" premium structure based on passenger "Mileage," and a "Covered Auto" definition triggered exclusively by the presence of a passenger. Given this, Defendants designated the Lyft platform as their *de facto* and exclusive agent for the sole purpose of collecting insurance premiums from the ultimate premium-paying insureds: the passengers.

80. ***Defendants' Control and Supervision via Bespoke Audit Endorsement*****:** Defendants reserved the right to exercise control and supervision over Lyft in the performance of the limited operation of the pass-through premium collection in a bespoke policy endorsement titled **"Premium Audit Conditions Amended" (Form MCA A 006 0622)**. Upon information and belief, this custom-drafted endorsement was specifically created for the Lyft policy and *replaces* the generic, boilerplate audit provision found in the standard Business Auto Coverage Form. This endorsement grants Defendants at least three distinct forms of control over the pass-through premium collection that are hallmarks of a principal-agent relationship:

a. ***Control over the Manner and Means of Performance*****:** The endorsement imposes affirmative, ongoing record-keeping obligations upon Lyft, requiring Lyft to "keep records of the information we need for premium computation, and send us copies at such times as we may request." This provision transforms Defendants' role from a passive recipient of data to an active supervisor with the power to demand progress reports and inspect its agent's work at any time, specifically as it relates to premium calculation and collection. This right to continuous, on-demand oversight of the premium pass-through operation is fundamentally different from a standard, retrospective audit and is a classic indicium of the control a principal exercises over an agent.

b. ***Reservation of Ultimate Unilateral Authority*****:** The endorsement cements Lyft's subordination by granting Defendants the ultimate authority to determine the

premium unilaterally. It provides that Lyft's refusal to cooperate will result in Defendants "developing and calculating a final premium based on information available to us and without your cooperation." This is not a mere remedy for breach of contract; it is the reservation of absolute power by the principal to perform the agent's core function itself and bind the agent to the outcome. This provision confirms that in the crucial area of premium calculation—the very function for which Lyft acts as an agent—Lyft's role is entirely subject to Defendants' final, overriding control.

c. ***The Contractual Right to Knowledge***: By retaining this pervasive right to audit and inspect the very mechanics of the premium collection and computation process—including the right to demand copies of all "information we need for premium computation" at will—Defendants were the architects of the pass-through funding mechanism. This level of detailed control over the specific agency function of premium accounting and collection is a definitive hallmark of a principal-agent relationship, demonstrating that Lyft was not an independent vendor but an agent acting subject to its principal's comprehensive oversight and control for these limited purposes.

81. ***Ratification***: Independently, and in the alternative, by their knowing conduct, Defendants ratified Lyft's role as their collection agent. Ratification occurs when a principal knowingly accepts the benefits of a transaction entered into by an agent on its behalf. Here, Defendants designed a premium structure based on passenger mileage, had actual or constructive knowledge, and intended, that this insurance cost was being directly passed through and collected from passengers via their fares, and knowingly accepted the benefits of that arrangement by receiving and retaining the massive volume of premium payments collected by Lyft through this exact mechanism. By accepting these premium payments, which Defendants knew or had reason to know were collected from passengers by Lyft for the specific purpose of funding Defendants' policy, Defendants affirmed and ratified Lyft's actions as their collection agent, thereby binding themselves

to the legal consequences of that relationship.

82. ***Legal Effect: Creation of a Direct Contract***: As a matter of settled law, payment by a third party to an authorized agent for the benefit of a principal constitutes payment to the principal. Here, the premium payments made by Plaintiffs and the California Insured Subclass to Lyft—Defendants' designated and ratified agent for premium calculation and collection—constituted valuable consideration furnished directly to the principal, Mobilitas. This exchange formed a direct, first-party insurance contract between Defendants and each member of the California Insured Subclass at the moment of the transaction. The consideration was the portion of the fare specifically designated for and paid to fund the insurance; the promise was the provision of an insurance product that complied with and gave to passengers what the law required.

### D. The Mechanics of the Illegal Scheme: How the Mileage-Based Premium and Lyft's Disclosures Establish Ascertainable Class-Wide Restitution

83. The financial injury to passenger-insureds was not an incidental byproduct of Defendants' scheme; it was its intended result. The entire purpose of engineering a UM/UIM product that unlawfully excluded core coverages was to drastically reduce Defendants' claims exposure. Because this contract was funded by passenger fares, the scheme was necessarily predicated on charging Lyft's California customers and Defendants' passenger-insureds for a legally compliant product while delivering a watered-down product with illegal provisions. The profit margin for Defendants was thus inflated by overcharging these consumers at the point of sale.

84. Critically, the damages suffered by the California Purchaser Class are not abstract or speculative. They are a direct, calculable, and intended outcome of the mechanics of Defendants' insurance scheme as established by a reading of the policy as a whole, and confirmed by both Defendants' and Lyft's explicit, public disclosures.

85. ***The Policy's Premium Structure Reveals a Passenger-Centric Calculation:*** On reasonable information and belief, the Mobilitas policy's premium is determined using a "Composite Rate" which applies a single rate to a unit of exposure: "Mileage." This premium structure is evidenced in the "Covered Auto Designation Symbol" (MCA A 002 0622).

86. This Defendant-authored endorsement defines a "covered auto" under the policy as a

vehicle "traveling with at least one 'ride-sharing' passenger…"

87. ***Premiums are Based on Passenger Mileage:*** This direct link between premium revenue and passenger mileage provides an objective basis for calculating restitution for the entire California Purchaser Class on a class-wide basis. The policy's structure allows for a common, formulaic determination of the pro-rata portion of the insurance premium attributable to each passenger's ride, whether calculated on a per-mile, per-ride, or other ratable basis to be confirmed through discovery. The data necessary for this calculation, including total premiums received and total passenger miles driven, is maintained by Lyft. However, and importantly, as required by the Defendant-drafted and imposed "Premium Audit Conditions Amended" (Form MCA A 006 0622), Lyft was required to give all of this information and data to Defendants. Therefore, logically, Defendants alone should have the information necessary to prove Plaintiffs' and the putative class members' claims. See ¶ 78-79, *supra*.

88. ***Confirmation of the Scheme: Lyft's Disclosures Admit to the Harm:*** In a clickable text box explaining the insurance cost disclosure, Lyft explains that "Insurance and other expenses…are distributed to each ride according to the number of miles driven…" This admission is a public confirmation of the internal mechanics of the mileage-based premium and establishes a clear, traceable harm from Defendants' imposed premiums to Plaintiffs and the Class.

89. In early 2025, Lyft began making the following disclosure on passenger ride receipts, identifying the exact amount the consumer or paying passenger had paid for insurance costs:

> "Help make this ride more affordable. Contact your lawmaker. $x.xx of your trip's fare went to estimated commercial auto insurance and other expenses. We're working with state lawmakers to update rideshare insurance requirements. Our goal is to improve affordability without compromising on insurance protections. In turn, we want to pass cost savings on to you."

90. In the above disclosure, the statement "Contact your lawmaker" is hyperlinked, and leads to a webpage where Lyft allows the customer to input their contact information to sign up in support of a petition to pass California Senate Bill 371. The text of the webpage reads:

> "Make California more affordable: Lower rideshare insurance costs by

> passing CA SB 371… The current $1 million uninsured/underinsured motorist (UM/UIM) coverage requirement for companies like Lyft and Uber is unfairly high. Taxis and limos don't have the same costly requirement, ***and these high insurance costs are passed directly on to riders like me through higher prices.***" (Emphasis added).[14]

91. Read together, the receipt and the webpage admissions establish an unbroken and irrefutable causal link between Defendants' conduct and the passengers' economic loss. The webpage explicitly admits that the cost of the "$1 million… UM/UIM" requirement is "passed directly on to riders." The receipt, in turn, quantifies the portion of the passenger's fare allocated to the overall insurance cost. This establishes that the insurance premium is a direct and discrete cost component of the passenger's fare, not a remote overhead expense. The harm is not incidental; it is an admitted feature of the pricing structure.

92. ***Defendants Had Actual or Constructive Knowledge of Lyft's Collection Practices:*** Defendants cannot plausibly claim ignorance of the fact that passenger fares – collected by their agent, Lyft - are the source of revenue used to pay for the TNC insurance premiums. As sophisticated and specialized insurers in the TNC market, Defendants had actual or constructive knowledge of this fundamental economic reality for at least three reasons:

93. **First**, it is a matter of universal common knowledge within the commercial insurance industry that passenger fares are the primary revenue source for TNCs and necessarily fund all major operational costs, the largest of which is insurance. As a sophisticated actor, Defendants are presumed to possess this basic industry knowledge.

94. **Second**, Defendants' premium is determined using a "Composite Rate" which bases the premium on passenger miles driven. By choosing passenger mileage—and not the number of vehicles or drivers—as the sole exposure base, Defendants directly and mathematically tied their premium revenue to the passenger's transaction. It is inconceivable that an insurer would structure its entire pricing model around passenger activity without knowing that the revenue from that same

---

[14] https://lyft.quorum.us/campaign/120112 (last accessed March 13, 2026)

passenger activity was the source of its premium payments.

95. **Third**, as discussed *supra*, Defendants had the contractual right to know and control their agent through their bespoke audit agreement with Lyft, which granted Defendants the pervasive right to audit and inspect the very mechanics of the premium collection and computation process.

**E. The Heightened Risk of an Unregulated, Non-Admitted Insurer**

96. The risk to Lyft's California customers and Defendants' passenger-insureds is magnified by Defendants' corporate structure and regulatory status. The Mobilitas policy discloses that it is a "surplus lines" insurer not licensed by the State of California. This "IMPORTANT NOTICE" explicitly warns consumers:

a. "The insurance policy that you have purchased is being issued by an insurer that is not licensed by the State of California."

b. "The insurer is not subject to the financial solvency regulation and enforcement that apply to California licensed insurers."

c. "The insurer does not participate in any of the insurance guarantee funds created by California law. Therefore, these funds will not pay your claims or protect your assets if the insurer becomes insolvent…"

97. This status is critical. A business model predicated on selling and administrating an insurance product with illegal terms inherently creates a heightened risk of financial instability, particularly when, as here, Mobilitas cedes 100% of its premium revenue to its parent, CSAA. If Defendant Mobilitas were to become insolvent, the California Purchaser Class would have no recourse to the California Insurance Guarantee Association (CIGA). This makes any legal remedy for damages (a simple money judgment) wholly inadequate, as it would be worthless against an insolvent, unregulated entity.

**F. Plaintiff Dickson's Experience**

98. Plaintiff Kyle Dickson's experience is representative of the harm suffered by the California Purchaser Class and the California Insured Subclass. On or about August 24, 2025, Plaintiff Dickson purchased and was the occupant of a ride through the Lyft mobile application. For

this ride, he was charged and paid itemized fees that comprised his total fare.

99. Critically, on the receipt for this transaction, Lyft, acting on behalf of Defendants for the purpose of collecting the insurance premium, made a direct and unambiguous written admission to Plaintiff Dickson. Below the fare itemization, Lyft confirmed in writing that a specific portion of his payment was being collected on behalf of its insurance partner, stating that $10.27 of his fare "went to estimated commercial auto insurance and other expenses."

> **Help make this $35.83 trip more affordable**
>
> **$10.27** of your trip's fare went to estimated commercial auto insurance and other expenses.*
>
> We're working with state lawmakers to update rideshare insurance requirements. Our goal is to improve affordability without compromising on insurance protections. In turn, we want to pass cost savings onto you. Learn more

100. This payment, collected by Defendants' agent for the express purpose of funding the mandatory insurance product provided by Defendants, constituted the consideration for the formation of a direct insurance contract. Under settled principles of agency law, payment to an authorized agent for the benefit of a principal is payment to the principal. The consideration for the insurance contract was therefore legally and effectively furnished directly to Defendants at the moment Plaintiff Dickson paid Lyft.

101. In exchange for this consideration, a direct, first-party insurer-insured relationship was formed, and Defendants immediately breached their contractual and quasi-fiduciary duties by providing less than what consumers expected and the law required.

### G. Plaintiff Wagner's Experience

102. Plaintiff William Wagner's experience is similarly representative. On January 28, 2023, March 28, 2023, January 3, 2025, and February 24, 2025, among other dates, Plaintiff Wagner purchased and was the occupant of rides through the Lyft mobile application within the State of California. For each ride, he was charged and paid itemized fares and fees.

103. For each transaction, Lyft, acting as Defendants' agent, collected funds to pay for the mandatory insurance coverage. This agency relationship and pass-through mechanism are confirmed

by Lyft's public admission on webpages linked from passenger receipts that "high insurance costs are passed directly on to riders." The payment of these fares by Plaintiff Wagner, made to Defendants' agent for the express purpose of funding Defendants' insurance, constituted direct consideration for the insurance contract. A first-party insurer-insured relationship was thereby formed between Plaintiff Wagner and Defendants, which Defendants immediately breached at the point of sale.

**H. Plaintiff Villanueva's Experience**

104. Plaintiff Kristine Villanueva's experience is similarly representative. On April 20, 2024, June 22, 2024, November 1, 2024, and February 16, 2025, among other dates, Plaintiff Villanueva purchased and was the occupant of rides through the Lyft mobile application in San Diego, California. For each of these rides, she was charged and paid itemized fares and fees.

105. For each transaction, Lyft, acting as Defendants' agent, collected funds to pay for the mandatory insurance coverage. The payment of these fares by Plaintiff Villanueva, made to Defendants' agent for the express purpose of funding Defendant's insurance, constituted direct consideration for the insurance contract. A first-party insurer-insured relationship was thereby formed between Plaintiff Villanueva and Defendants, which Defendants immediately breached at the point of sale.

106. ***Breach and Harm to All Plaintiffs and the Subclass*****:** From October 1, 2022 through the date of this First Amended Complaint, the sole operative commercial TNC insurance policy covering Lyft passengers in California has been issued by Defendant Mobilitas. In every transaction, Plaintiffs and all members of the California Insured Subclass paid valuable consideration, through Defendants' agent Lyft, for Mobilitas's specific promise of financial security that complied with all legal requirements. Their reliance on the legality and validity of this mandatory insurance product was justifiable and required.

107. ***Delayed Discovery of Harm:*** Upon submitting payment to Lyft for the insurance premiums and at all times afterward, Plaintiffs Dickson, Wagner, and Villanueva, had no reason whatsoever to believe that they had overpaid for insurance that did not meet the legal requirements under California law. As third-party beneficiaries to Defendants' insurance contract, they were also

never granted the opportunity or ability to view the Uninsured/Underinsured Motorist policy endorsement contained therein, and this document was never released publicly. As a result of this lack of transparency, even had Plaintiffs suspected they had overpaid for this insurance, any reasonable and diligent investigation would not, and indeed *could not*, have disclosed to them the unlawful nature of Defendants insurance coverage which resulted in their damages. Indeed, Plaintiffs Dickson, Wagner, and Villanueva did not discover the illegality of Defendants' policy provisions, or that they had suffered damages flowing therefrom, until October 2025.

108. As a direct result of Defendants' scheme, Plaintiffs and the California Purchaser Class suffered a concrete economic injury, and, for Plaintiffs and the California Insured Subclass, a tortious invasion of their rights as insureds. They paid for a legally compliant insurance product but received a significantly devalued one riddled with provisions that violated state law. The portion of their fares paid to Defendants' agent to fund this mandatory insurance was thus lost money, paid in exchange for a product that was materially and fundamentally different from, and of less value than, what the law requires and what Defendants implicitly promised to provide.

## CLASS ACTION ALLEGATIONS

109. Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Federal Rule of Civil Procedure 23. This action is well-suited for class treatment because it challenges a uniform, centralized, and systematically applied scheme of unlawful conduct. The legality of Defendants' standardized policy forms is the central issue of the litigation. This common question can be answered for all class members in a single stroke, making class resolution not only superior but essential for the fair and efficient adjudication of this controversy.

110. Plaintiffs bring this action pursuant to Rule 23(b)(2) and/or Rule 23(b)(3) of the Federal Rules of Civil Procedure, individually and on behalf of the following Class and Subclass, of which Plaintiffs are members, which are defined as follows:

> **California Purchaser Class ("The Class")**:
> *(Represented by Plaintiffs Dickson, Wagner and Villanueva)*
> All California residents who, from October 1, 2022 through the date of class certification, paid Lyft for ride-share services provided within the State of California.

> **California Insured Subclass ("The Subclass")**:
> *(Represented by Plaintiffs Dickson, Wagner and Villanueva)*
> All members of the California Purchaser Class who were also occupants of the ride-share vehicle for the ride(s) they purchased.

111. Excluded from the Class and Subclass are Defendants, their officers and directors, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

112. Plaintiffs reserve the right to redefine the Class and Subclass as appropriate based on discovery and specific theories of liability.

113. Plaintiffs and members of the Class and Subclass were harmed by Defendants' fraudulent insurance scheme at the point of sale for each Lyft ride. Funds paid by class members to Lyft, and then passed through Lyft to Defendants, were retained by Defendants for a legally compliant, primary UM/UIM policy, while secretly providing a product engineered with illegal exclusions and practices designed to systematically deny or delay claims made under the policy. The direct harm to Plaintiffs and the Class was therefore the economic injury of overpaying for this insurance product with illegal provisions. They paid for the full value of a lawful insurance safety net but received a materially less valuable, non-compliant product, thereby losing the money they paid for the promised-but-undelivered protection.

114. **<u>Numerosity</u>**: Upon information and belief, the members of the Class and Subclass are so numerous that joinder of all of them is impracticable.

115. The exact number of the members of the Class and Subclass are unknown to Plaintiffs at this time and can be determined through appropriate discovery. However, given that, on information and belief, Defendants have insured Lyft in California since at least October 1, 2022, it is realistic to infer that class numbers will total in the millions, such that the Class and Subclass are so numerous that joinder of all members is impracticable. The disposition of the claims in a class action will provide substantial benefits to the parties and the Court.

116. **<u>Ascertainability</u>**: The proposed Class and Subclass are precisely defined and clearly

ascertainable by reference to objective criteria. Lyft maintains detailed electronic records of every ride transaction, including the passenger, date, and fare/fees paid. Membership can be determined by cross-referencing these records with the time period during which the unlawful Mobilitas policy was in effect.

117. **The California Purchaser Class** is ascertainable by reference to objective criteria and through a ministerial review of Lyft's electronic transactional records, which document the identity of the account holder who paid for every ride during the class period.

118. **The California Insured Subclass** is ascertainable through a further ministerial review of those same records. Upon information and belief, Lyft's data can identify and distinguish transactions where the purchaser was not the rider (e.g., rides booked using a "book for a friend" feature or where rider information differs from account holder information). These "guest ride" transactions will be excluded from the Subclass, yielding a "pure" list of all members of the Subclass.

119. Ascertainability of restitution and damages for the Class and Subclass are irrefutably established by Defendants' and Lyft's own records and public admissions. The disclosure on Lyft's receipts admits that insurance costs are "distributed to each ride according to the number of miles driven." This admission, combined with the policy's Composite Rate based on "Mileage," provides a uniform and objective basis for calculating restitution and/or damages for the entire Class and Subclass. This data allows for the application of a common methodology to determine each class member's economic loss, whether calculated on a per-mile, per-ride, or other ratable basis to be confirmed through discovery. The existence of these comprehensive digital records makes class member identification and the calculation of restitution and damages a matter of ministerial data analysis, readily manageable in a class action.

120. **<u>Typicality</u>**: Plaintiffs' claims are typical of the Class and the Subclass. As individuals who purchased and occupied Lyft rides, they are members of both groups. Their claims are typical of the California Purchaser Class because they, like all members, lost money by paying for a service package that included an insurance component with illegal provisions and limited value. Their claims

are typical of the California Insured Subclass because they, like all Subclass members, were direct insureds who were harmed by Defendants' breach of direct contractual and quasi-fiduciary duties.

121. Plaintiffs will fairly and adequately represent and protect the interests of the Class in that Plaintiffs have no interests antagonistic to any member of the Class.

122. **Adequacy**: Plaintiffs are qualified to and will fairly and adequately protect the interests of the members of the Class and Subclass with whom they are similarly situated, as demonstrated herein. Plaintiffs acknowledge that they have an obligation to make known to the Court any relationships, conflicts, or differences with any Class Member.

123. Plaintiffs' interests in this matter are not directly or irrevocably antagonistic to the interests of the members of the Class or Subclass.

124. Plaintiffs will vigorously pursue the claims of the members of the Class and Subclass.

125. Plaintiffs have retained counsel experienced and competent in class action litigation and California insurance law. Plaintiffs' attorneys, the proposed class counsel, are versed in the rules governing class action discovery, certification, and settlement.

126. Plaintiffs' counsel will vigorously pursue this matter.

127. Plaintiffs' counsel will assert, protect and otherwise represent the members of the Class and Subclass.

128. Plaintiffs have incurred, and throughout the duration of this action, will continue to incur costs and attorneys' fees that have been, are, and will be, necessarily expended for the prosecution of this action for the substantial benefit of each Class Member.

129. **Commonality and Predominance**: There are numerous questions of law and fact common to the Class and Subclass, and these common questions predominate over any potential individual issues. The central common question for the entire California Purchaser Class is whether Defendants engaged in an unlawful and fraudulent business practice by designing and selling an insurance product with illegal provisions funded by Lyft's customers. The central common questions for the California Insured Subclass are whether Defendants breached their direct contractual and bad faith duties owed to their insureds. The answer to these questions "will resolve an issue that is central

to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

130. There are predominating common questions of law and fact as to all members of the Class, including but not limited to the following:

a. Whether Mobilitas's policy language and uniform practice of denying primary coverage under its UM/UIM coverage violates California Public Utilities Code § 5433(b), and whether that renders Defendants' UM/UIM policy less valuable than consumers expected and the law required;

b. Whether Mobilitas's uniform practice of requiring a notice of claim denial from a TNC passenger's personal auto insurer violates California Public Utilities Code § 5433(d), and whether that renders Defendants' UM/UIM policy less valuable than what consumers expected and the law required;

c. Whether Defendants' business practice of charging Defendants' passenger-insureds for a devalued insurance product with illegal provisions through passenger fares and fees constitutes an unfair, unlawful, or fraudulent business practice under Cal. Bus. & Prof. Code §§ 17200, *et seq.*;

d. Whether Defendants' passengers-insureds paid for a legally compliant insurance product but received a materially less valuable product riddled with unlawful provisions;

e. Whether Defendants' business practice of charging consumers for this less valuable insurance product with unlawful provisions constitutes an unfair, unlawful, or fraudulent business practice under the UCL;

f. Whether Defendants breached their direct contractual duties owed to the members of the Subclass;

g. Whether Defendants breached the implied covenant of good faith and fair dealing owed to the members of the Subclass;

h. Whether Defendants' conduct was malicious, oppressive, or fraudulent, warranting

punitive damages for the Subclass;

i. Whether Mobilitas misrepresented the scope of its UM/UIM coverage;

j. Whether CSAA created, implemented, mandated, and enforced the illegal policy provisions described herein;

k. Whether Plaintiffs and the Class are entitled to restitution for the portion of fares paid for this insurance product riddled with unlawful provisions;

l. Whether Mobilitas's policy, when read as a whole to give effect to all its parts, requires that the mileage-based premium be calculated based on passenger-occupied mileage, thereby providing a common, formulaic basis for calculating restitution;

m. Whether Defendants, through the requirements of the Defendant-draft and imposed "Premium Audit Conditions Amended" (Form MCA A 006 0622), have in their possession the premium calculation and collection information applicable to Plaintiffs and the members of the putative class(es) (*see* ¶ 77, *supra*); and

n. Whether Defendants should be enjoined from engaging in such conduct in the future.

131. **Superiority**: A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

132. **Economic Impracticability of Individual Claims:** The financial barriers to individual litigation are insurmountable for any individual class member. The cost of retaining expert counsel to litigate a complex insurance case involving novel statutory interpretation would vastly exceed the potential recovery for an individual class member. These are classic "negative value" claims, where the cost of pursuit outweighs the individual recovery, making a class action the only viable mechanism for redress. Absent a class action, Defendants would be permitted to retain the fruits of their illegal scheme, and millions of California Lyft customers would be left without a remedy.

133. **Judicial Economy and Avoidance of Inconsistent Rulings:** In the absence of a class action, courts across California would be inundated with thousands of individual lawsuits all raising the identical legal challenges to Defendants' uniform policy and practices. This would result in an

enormous waste of judicial resources and create the serious risk of inconsistent or varying adjudications on the same questions of statutory interpretation, establishing incompatible standards of conduct for Defendants and unequal rights among similarly situated insureds.

134. **Manageability:** This action is eminently manageable as a class action. The proposed Class and Subclass are clearly defined, liability is based on common proof of Defendants' standardized conduct and policy, and damages for the Class and Subclass can be calculated through a formulaic administrative process using Defendants' and Lyft's centralized electronic records. This makes class notice and administration straightforward.

135. **Propriety of Injunctive Relief:** Defendants have acted and refused to act on grounds generally applicable to the entire Class, making final declaratory and injunctive relief appropriate. Class-wide relief is essential not only to remedy the past economic harm but also to deter Defendants from continuing their unlawful conduct, thereby preventing future harm to the public.

## FIRST CAUSE OF ACTION

### DECLARATORY RELIEF

### (ON BEHALF OF PLAINTIFFS DICKSON, WAGNER, VILLANUEVA, AND THE CALIFORNIA PURCHASER CLASS AGAINST ALL DEFENDANTS, WITH LIABILITY AGAINST CSAA ASSERTED UNDER ALTER EGO, DIRECT PARTICIPATION, AND AGENCY THEORIES)

136. Plaintiffs and the California Purchaser Class re-allege and incorporate by reference each preceding paragraph as though fully set forth herein.

137. Pursuant to 28 U.S. Code § 2201, this Court is authorized to declare the rights and other legal relations of interested parties in the case of an actual controversy. At all relevant times, Defendants knew or should have known that its conduct as alleged herein violated California law.

138. An actual and present controversy has arisen and now exists between Plaintiffs and the Class, on the one hand, and Defendants, on the other, concerning their respective rights and duties under Mobilitas's insurance policy and relevant California law. Plaintiffs and the Class have standing to seek these declarations because each illegal provision and related practice renders the insurance policy they funded less than what consumers expected and what the law required, causing them a

concrete economic injury.

139. As alleged herein, Plaintiffs and the Class contend that, prior to January 1, 2026,[15] Mobilitas's UM/UIM coverage must be primary, an interpretation consistent with the California Legislature's own stated understanding of 'existing law,' which separately and explicitly requires primary coverage for ***both*** '$1 million for death, personal injury, and property damage' and '$1 million in underinsured and uninsured motorist coverage'; that Mobilitas is precluded by California law from requiring a coverage denial from an insured passenger's personal auto policy as a precondition to coverage; and that Mobilitas's duty to process UM/UIM claims under this policy is not delayed or excused by the existence of a personal UM/UIM; and that Defendants' conduct is resulting in their providing less than what Plaintiffs and the putative class members' expect and what the law requires.

140. Defendants, by their uniform conduct, contend that Mobilitas's primary duty, prior to January 1, 2026, applied only to liability coverage[16], a position in direct and irreconcilable conflict with both the plain language of the statute and the Legislature's itemized affirmation of its meaning; that Mobilitas is permitted to require a coverage denial from an insured passenger's personal auto insurer as a precondition to UM/UIM coverage; and that Mobilitas's duty to process UM/UIM claims can either be delayed or excused by the existence of a personal UM/UIM.[17]

141. A judicial declaration is necessary and appropriate at this time so that the parties may ascertain their rights and duties under the policy and California law. Such a declaration is necessary to prevent Mobilitas from continuing its unlawful scheme and collecting inflated policy premiums from Class Members, and to resolve the uncertainty for all Class Members insured under the unlawful

---

[15] Pursuant to the passage of SB371, California Public Utilities Code §5433 updated its language, effective January 1, 2026, adding a clarifying provision which reinforces the primacy requirement of TNC UM/UIM coverage. Upon information and belief, Defendants contend that, as a result, the UM/UIM primacy requirement only became effective beginning January 1, 2026. Plaintiffs, along with California's legislature, strongly disagree.

[16] *See Id.*

[17] Despite Defendants' position that as a result of the amended language of CPUC §5433, TNC UM/UIM insurance is now primary as of January 1, 2026, Defendants' positions that they are 1) allowed to require a coverage denial from an insured passenger's personal auto insurer as a precondition to UM/UIM coverage; and 3) that Defendants' duty to process UM/UIM claims can either be delayed or excused by the existence of a personal UM/UIM, remain unchanged, and Defendants continue to operate under according to these policies and practices for all UM/UIM claims made after January 1, 2026.

policy. The risk of future harm under the unlawful policy is not speculative, but is a real and immediate threat to every member of the Class, creating a present and ongoing controversy ripe for judicial resolution.

142. Plaintiffs, on behalf of the Class, therefore, seek the following declarations from the Court:

a. Pursuant to California Public Utilities Code § 5433(b), as written and enforced prior to January 1, 2026,[18] the UM/UIM coverage provided under Defendants' TNC insurance policy is primary, and any policy provision purporting to render this coverage "excess" or "secondary," including but not limited to the limit-reduction clause in Section (D)(4) of the policy endorsement, is void *ab initio* and unenforceable.

b. Defendants' practice of requiring an insured to first seek and obtain a denial of coverage from a personal automobile insurance policy before Defendant will investigate, evaluate, or pay UM/UIM benefits, constitutes the imposition of an unlawful precondition to coverage. It should be further declared that this practice violates the primacy mandate of Public Utilities Code § 5433(b) and the express prohibition against such preconditions in Public Utilities Code § 5433(d), and is therefore unenforceable.

c. Defendants have an immediate and independent duty under California law to promptly investigate and pay all undisputed benefits owed under the policy, which is not delayed or excused by the existence of any other insurance.

d. Pursuant to Public Utilities Code § 5443, the duties and obligations set forth in the TNC insurance article are exclusive and controlling, and Defendants are statutorily prohibited from relying on any other policy of insurance or any other law to render its mandatory UM/UIM coverage secondary or excess.

[18] *See Id.*

## SECOND CAUSE OF ACTION

**VIOLATION OF CAL. BUS. & PROF. CODE §§ 17200, *ET SEQ*.**

**(ON BEHALF OF PLAINTIFFS DICKSON, WAGNER, VILLANUEVA, AND THE CALIFORNIA PURCHASER CLASS AGAINST ALL DEFENDANTS, WITH LIABILITY AGAINST CSAA ASSERTED UNDER ALTER EGO, DIRECT PARTICIPATION, AND AGENCY THEORIES)**

143. Plaintiffs re-allege and incorporate by reference each preceding paragraph as though fully set forth herein.

144. California's Unfair Competition Law ("UCL") prohibits any "unlawful, unfair or fraudulent business act or practice." Defendants' conduct, as alleged herein, constitutes a single, uniform business practice that violates all three prongs of the UCL, directly causing injury to the members of the California Purchaser Class.

145. **Unlawful Prong:** Defendants' conduct is unlawful because it is predicated on direct, systematic, and repeated violations of California statutes, regulations, and common law duties, including but not limited to:

a. California Public Utilities Code § 5433(b)'s mandate that TNC insurance "shall be primary";

b. California Public Utilities Code § 5433(d)'s express prohibition on requiring a denial from a personal auto policy as a precondition to coverage; and

c. Multiple provisions of California's Unfair Insurance Practices Act, Insurance Code § 790.03, et seq., including, without limitation:

i) Knowingly representing pertinent facts and policy provisions relating to the primary nature and scope of UM/UIM coverage, in violation of § 790.03(h)(1); and

ii) Knowingly misrepresenting pertinent facts and policy provisions relating to the purportedly "required" preconditions, in violation of Public Utilities Code § 5433(d);

d. Violation of Common Law Duties of Contract and Good Faith: Defendants' conduct also violates fundamental common law duties owed to the members of the California Insured Subclass. Specifically, selling an insurance policy riddled with unlawful provisions, failing to place the insureds' interests on equal footing with its own, and engaging in a fraudulent scheme to deny its insureds the primary benefit of peace of mind and financial security, as well as the right to seek coverage that complies with state law. Each of these breaches of common law provides an independent basis for finding Defendants' challenged business practice unlawful.

Each of the specific unlawful types of conduct identified above directly harmed members of the California Purchaser Class who paid for a legally compliant insurance product but received a less valuable one with illegal provisions.

146. **Unfair Prong:** Defendants' conduct is unfair because Defendants, with their superior knowledge and industry experience, drafted a legally deficient policy to provide UM/UIM coverage to Plaintiffs and the putative class members and overcharged them premiums for this coverage with illegal provisions. This resulted in Plaintiffs and the putative class members receiving less than they were expecting and what the law required.

147. Defendants' flouted the legislative framework governing TNCs and the documented concerns of state regulators, all while collecting premiums from consumers. Defendants line their pockets with Plaintiffs' and the class members' money while taking on less risk than the law required. That is unfair specifically to Plaintiffs and the putative class members' and to all consumers and citizens of the State of California.

148. **Fraudulent Prong:** Defendants' conduct is fraudulent because it is likely to deceive reasonable consumers. The "business act or practice" at issue is the entire scheme of designing and issuing an insurance product with illegal provisions funded by customer fares. This practice is fraudulent because it is predicated on a material omission: concealing the unlawful nature of the insurance provisions from the consumers who were funding it.

149. This practice is inherently deceptive for at least two reasons. **First**, there exists a severe information asymmetry between the parties. Defendants, as sophisticated insurers, possessed exclusive knowledge of their policy provisions' non-conformity with California law. In contrast, a reasonable consumer purchasing a rideshare service has no means of discovering the legal defects of the underlying commercial insurance policy provisions. They reasonably rely on the deeply ingrained presumption that a mandatory, regulated product offered by a major corporation complies with the law. Defendants exploited this asymmetry by concealing the unlawfulness of its policy provisions from consumers.

150. **Second**, the omitted information—that the secondary/"excess" and "required preconditions" insuring provisions were illegal, void, and provided less than the law required—is material. Had this information been disclosed, a reasonable consumer would not have paid or paid significantly less for the premium component of the fare for this less valuable product. By designing and profiting from a product/service with this concealed, material nonconformity with the law, Defendants engaged in a practice likely to deceive the public, directly causing the economic injury suffered by the California Purchaser Class at the point of sale.

151. **Injury in Fact and Lost Money as a Result of Unfair Competition:** As a direct result of Defendants' unlawful and fraudulent business practices, Plaintiffs and the Class have suffered injury in fact and have lost money or property within the meaning of Business and Professions Code § 17203. This causal link is not a matter of inference; it is established by the direct public admissions of Lyft.

152. On a public-facing webpage linked from passenger receipts, Lyft explicitly admits that the high costs of the "**$1 million uninsured/underinsured motorist (UM/UIM) coverage requirement…are passed directly on to riders like me through higher prices.**"[19] The specific amount of the total passed-through insurance cost is quantified on the receipts themselves, which state that "**$x.xx of your trip's fare went to estimated commercial auto insurance**…"

[19] https://lyft.quorum.us/campaign/120112 (last accessed November 13, 2025)

153. Read together, these statements identify that Plaintiffs and the Class were charged a specific, itemized amount to pay for what was represented to be a legally compliant, "$1 million uninsured/underinsured motorist (UM/UIM)" policy.

154. The Defendant-defined, calculated, and imposed premium payments made by Plaintiffs and the Class to Lyft for what was represented to be a legally compliant UM/UIM policy were then passed from Lyft to Defendants. Thus, the money paid by Plaintiffs and the Class was lost as a direct result of this charge.

155. An insurance policy's sole value is its legally enforceable promise of security. A promise to perform an illegal act, or a promise predicated on illegal terms, is not lawful consideration. Defendants' policy, with its unlawful exclusions and primacy-negating clauses, provided significantly less security than Defendants represented, consumers expected, and the law required.

156. Consequently, Plaintiffs and the Class were deprived of the benefit of their bargain. The causal connection is direct: had the insurance product been represented as the product it was (an insurance product containing key unlawful provisions), Plaintiffs and the Class would not have paid as much as they did for it. The economic loss is therefore quantifiable as the portion of the premiums attributable to the illegal UM/UIM coverage, in an amount to be determined through discovery of Defendants' rating and pricing data. This economic loss is directly calculable and its recovery is necessary to restore the parties to the status quo ante and prevent Defendants from retaining the fruits of their illegal scheme.

157. **Inadequacy of Legal Remedy:** Plaintiffs and the California Purchaser Class seek equitable relief under the UCL, including restitution and injunctive relief, and plead these claims in the alternative to their legal claims pursuant to Federal Rule of Civil Procedure 8(d). While Plaintiffs have asserted legal claims for breach of contract, bad faith, and intentional misrepresentation, these legal remedies, even when considered in their totality, are inadequate to make the entire California Purchaser Class whole and to fully address the harms caused by Defendants' scheme. The inadequacy of legal remedies is established for several independent reasons:

a. **Structural Inadequacy for Portions of the Class**: The most potent legal remedies for breach of contract and bad faith are, as pleaded, available only to the narrower California Insured Subclass. These remedies provide no relief whatsoever for members of the broader California Purchaser Class who purchased rides for others and thus do not have standing for a direct contract or bad faith claim.

b. **Qualitative Inadequacy of a Money Judgment:** The legal claims for breach of contract, bad faith, and intentional misrepresentation culminate in a money judgment. As alleged herein, Defendant Mobilitas operates as a non-admitted, surplus lines insurer and is not a member of the California Insurance Guarantee Association (CIGA). This means any money judgment at law is a hollow and inadequate remedy against the significant risk of the defendant's insolvency. The equitable remedy of a **constructive trust** over the specific *res* of wrongfully obtained premiums is qualitatively superior and necessary to secure a meaningful recovery for the entire California Purchaser Class and to prevent Defendants from shielding their ill-gotten gains.

c. **Superiority of Broad Public Injunctive Relief:** Legal claims for damages, including for intentional misrepresentation, are primarily backward-looking and designed to compensate individual plaintiffs for past harm. In contrast, the UCL is uniquely designed to provide broad, forward-looking **public injunctive relief** to halt Defendants' entire unlawful and fraudulent business practice, thereby protecting all future California consumers from this scheme. This comprehensive, public-facing remedy is not the primary purpose or typical outcome of a private tort claim for fraud, rendering the legal remedies inadequate to achieve the full scope of statutory protection afforded by the UCL.

d. **Breadth of Equitable Monetary Recovery:** The monetary relief available under the UCL is not merely duplicative of "out-of-pocket" fraud damages. The UCL's equitable powers extend to the full **disgorgement of all ill-gotten gains** necessary

to prevent unjust enrichment. This can include, for example, any profits or interest Defendants earned while in possession of the wrongfully obtained premiums, a remedy that may be broader than the legal damages available for intentional misrepresentation.

158. Pleading in the alternative is therefore proper under Federal Rule of Civil Procedure 8(d) to ensure a complete remedy.

159. **Equitable Relief Sought: Constructive Trust:** As a direct result of Defendants' unlawful, unfair, and fraudulent business practices, Defendants have been unjustly enriched by their receipt of the premium payments from Plaintiffs and the California Purchaser Class. These wrongfully obtained funds constitute a specific, identifiable res that rightfully belongs to the Class. To prevent Defendants from dissipating or shielding these ill-gotten gains and to secure a meaningful recovery in light of Defendants' non-CIGA status, Plaintiffs, on behalf of the Class, request that the Court exercise its equitable power to impose a constructive trust pursuant to California Civil Code §§ 2223 and 2224, over all premium amounts paid by the Class to Defendants, as well as any profits derived therefrom, including any and all applicable interest.

160. Plaintiffs and the Class are therefore entitled to equitable relief, including a permanent injunction enjoining Defendants from continuing these unlawful, unfair, and fraudulent practices, and an order requiring Defendants to make full restitution through the imposition for a constructive trust as described above.

## THIRD CAUSE OF ACTION

### BREACH OF CONTRACT

### (ON BEHALF OF PLAINTIFFS DICKSON, WAGNER, VILLANUEVA, AND THE CALIFORNIA INSURED SUBCLASS AGAINST ALL DEFENDANTS, WITH LIABILITY AGAINST CSAA ASSERTED UNDER ALTER EGO, DIRECT PARTICIPATION, AND AGENCY THEORIES)

161. Plaintiffs and the California Insured Subclass re-allege and incorporate by reference each preceding paragraph as though fully set forth herein.

162. **Formation of Contract:** A valid and enforceable contract of insurance was formed between Defendant Mobilitas and Plaintiffs and the members of the California Insured Subclass.

i. **Offer and Acceptance:** Defendants offered to provide UM/UIM insurance coverage to passengers occupying Lyft vehicles in California, as required by California Public Utilities Code § 5433. The terms of this offer were memorialized in the Mobilitas policy issued to Lyft, including the UM/UIM Endorsement (Form MCA P 008 CA 0822). Section B(2)(a) of that endorsement expressly defines an "insured" as "anyone 'occupying' a covered 'auto'." By summoning and occupying a Lyft vehicle, Plaintiffs and the California Insured Subclass accepted this offer of insurance coverage.

ii. **Consideration:** Plaintiffs and the Subclass provided valuable consideration for this contract. The portion of the passenger fares specifically earmarked for insurance premiums, which were paid by Plaintiffs and the Subclass, then passed through by Lyft to Defendants, constituted the premium payments for the UM/UIM coverage, thereby satisfying the consideration element.

160. **Plaintiffs' Performance:** Plaintiffs and the members of the Subclass fully performed all conditions, covenants, and promises required on their part to be performed under the contract, by virtue of paying the required fares and fees that funded the insurance premiums to Defendants' agent, Lyft.

161. **Reformation by Law:** As a matter of law, the terms of the insurance contract are automatically reformed to include all mandatory provisions of California law. This includes, but is not limited to, the non-delegable duty under Public Utilities Code § 5433 that the UM/UIM coverage **"shall be primary**" and that there be no preconditions.

162. California law provides that when an insurance policy fails to conform to statutory requirements, the policy is automatically reformed by operation of law to include the mandatory

provisions.[20] This long-standing doctrine, however, is not a self-executing absolution for an insurer's unlawful conduct.[21] Thus, the doctrine of reformation does not mean Plaintiffs received a lawful policy; it means they acquired the *right to sue to enforce a lawful policy* after Defendants had already breached their primary duty to provide one.

163. **Defendants' Breach, Which Occurred at Inception:** Defendants materially breached their contractual duties at the moment the contracts with Plaintiffs were formed. The benefit of the bargain in an insurance contract is not the mere paper it is written on; it is the legally enforceable promise of financial security and peace of mind. By issuing a policy containing core provisions that were illegal and void as against the public policy of California—including the unlawful "excess" clauses and the requirement of preconditions—Defendants did not provide this benefit.

164. **Defendants' Material Breach**: Defendants breached the contract by, inter alia:

i. **Failure of Consideration**: Failing to provide the primary benefit of the bargain—a legally enforceable promise of financial security—and instead providing a policy with illegal terms that was unenforceable and worth significantly less than what Plaintiffs paid for at inception.

ii. **Breach of the Law-Imposed Duty to Provide a Compliant Product**: Instead of a policy that conformed to the mandates of Public Utilities Code § 5433 (primacy), Defendants provided a product with illegal provisions designed to evade those duties. The subsequent availability of a reformation remedy does not excuse this initial breach.

165. **Resulting Damages:** As a direct and proximate result of Defendants' breach of contract, Plaintiffs and the members of the Subclass have been damaged. They suffered a complete

---

[20] *See, e.g.*, Cal. Fair Plan Ass'n v. Garnes, 11 Cal.App.5th 1276, 1305 (2017) ("All insurance policies issued in California are governed by the provisions of the Insurance Code. When insurance coverage is required by law, the statutory provisions are incorporated into the insurance contract. The obligations under an insurance policy are measured and defined by the pertinent statute, and the statute and the policy together form the insurance contract.")

[21] It is a protective shield for the insured, designed to prevent insurers from drafting their way out of statutory obligations and to guarantee a remedy for an insured who receives an illegal policy. *See Id.* ("This general principle is subject to the condition that statutory provisions may not be read into a policy to the insured's detriment, even where the statutory language appears mandatory.")

or substantial failure of consideration at the point of sale, having paid for a fully legally compliant, primary insurance policy that provides immediate, enforceable security, but received a substantially less valuable one that contains illegal provisions. Their damages consist of, at a minimum, the amount they overpaid for this insurance policy with illegal provisions, which was paid to Lyft and then passed directly to Defendants by Lyft, representing the difference between the value of the insurance as promised by law and the value of the insurance as delivered by Defendants, in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION

### BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

### (ON BEHALF OF PLAINTIFFS DICKSON, WAGNER, VILLANUEVA, AND THE CALIFORNIA INSURED SUBCLASS AGAINST ALL DEFENDANTS, WITH LIABILITY AGAINST CSAA ASSERTED UNDER ALTER EGO, DIRECT PARTICIPATION, AND AGENCY THEORIES)

166. Plaintiffs and the California Insured Subclass re-allege and incorporate by reference each preceding paragraph as though fully set forth herein.

167. **Existence of a Direct Insurance Relationship and Implied Covenant**: As alleged above, a direct, first-party contractual relationship existed between Defendants and Plaintiffs and the Class, who are "insureds" under the plain language of the Mobilitas UM/UIM endorsement. Implied in this contract is a covenant of good faith and fair dealing, which imposed upon Defendants a duty to act fairly and in good faith toward its passenger-insureds and to refrain from doing anything that would injure their right to receive the benefits of the contract. This duty required Defendants to, among other things, place the interests of its insureds on at least equal footing with its own financial interests.

168. **Breach of the Implied Covenant**: Defendants breached the implied covenant of good faith and fair dealing owed to Plaintiffs and the California Insured Subclass by, among other things, engaging in a bad faith scheme at the inception of the contract to design, market, and profit from an insurance product with illegal and unenforceable provisions. By selling a false promise under the guise of a legally compliant policy, Defendants tortiously injured the right of their insureds to receive

the primary benefit of the insurance agreement: legally enforceable financial security. This bad faith scheme was effectuated through, and its fraudulent intent is evidenced by, a series of conscious and deliberate acts, which also constitute violations of California's Unfair Insurance Practices Act (UIPA) and Cal. Ins. Code § 790.03, et seq. These acts include but are not limited to the following:

i. ***Devising and Selling an Insurance Product with Key Illegal Provisions***: The quintessential act of bad faith was Defendants' premeditated decision to design and place into the stream of commerce a UM/UIM insurance product with core policy provisions Defendants knew or should have known were illegal and void as against the public policy and clear statutory law of California. The creation and sale of this product was a breach of the duty of good faith owed to every insured at the moment of purchase.

ii. ***Systematically Refusing to Honor the Policy as Reformed by Law:*** Defendants' bad faith intent is further demonstrated by their uniform claims-handling protocol, which is designed to enforce the illegal policy terms rather than honor the policy as it is reformed by law. Upon information and belief, when confronted with a UM/UIM claim from an injured insured, Defendants systematically refuse to provide the full benefits of a legally compliant policy by, among other actions: (1) Wrongfully misrepresenting that their coverage is "secondary" in direct violation of the primacy mandate of Public Utilities Code § 5433, as detailed in their policy at Section D(4); (2) Unlawfully failing to adopt and implement reasonable standards for the prompt investigation; and (3) Knowingly misrepresenting pertinent facts and policy provisions relating to the mandatory scope of coverage, in violation of Insurance Code § 790.03(h)(1).

iii. ***Placing the Insurer's Financial Interests Above the Insureds':*** The entire scheme—from the initial design of the product to the uniform enforcement of its unlawful provisions—was conceived for the sole purpose of elevating

Defendants' own financial interests above the fundamental rights of their insureds. This conduct, which allowed Defendants to profit by selling a product with unlawful provisions, is the very essence of insurance bad faith.

169. **Unreasonable and Without Proper Cause**: Defendants' conduct was unreasonable and undertaken without proper cause. Defendants' interpretation and application of California's TNC and UM/UIM insurance statutes were not the result of a good faith mistake or a genuine dispute over legal duties. The legislative framework, including, but not limited to, the primacy mandate of PUC § 5433, is clear and unambiguous. Defendants' actions constituted a conscious and deliberate disregard of the known rights of their insureds.

170. **Resulting Damages:** As a direct and proximate result of Defendants' bad faith conduct, Plaintiffs and the Subclass have been harmed. They have been denied the primary benefit of their insurance contract: the peace of mind and financial security of a legally compliant and primary UM/UIM policy. They have suffered economic loss in the form of premiums paid for this diminished-value product.

171. **Punitive Damages:** Defendants' conduct, as alleged herein, was carried out with malice, oppression, and fraud, warranting an award of punitive damages pursuant to California Civil Code § 3294. Defendants' actions constituted a willful and conscious disregard for the rights and safety of Plaintiffs and the Subclass. The systematic scheme to design and profit from an insurance product with key illegal terms demonstrates a despicable pattern of corporate conduct undertaken with the motive of enriching Defendants at the expense of the public. An award of punitive damages is necessary to punish Defendants for this conduct and to deter them and other insurers from engaging in similar misconduct in the future.

## FIFTH CAUSE OF ACTION

### INTENTIONAL MISREPRESENTATION

### (ON BEHALF OF PLAINTIFFS DICKSON, WAGNER, VILLANUEVA, AND THE CALIFORNIA PURCHASER CLASS AGAINST ALL DEFENDANTS, WITH LIABILITY AGAINST CSAA ASSERTED UNDER ALTER EGO, DIRECT PARTICIPATION, AND AGENCY THEORIES)

172. Plaintiffs re-allege and incorporate by reference each preceding paragraph as though fully set forth herein.

173. Defendants had a non-delegable duty to disclose the true, unlawful nature of their insurance product to Plaintiffs and the California Purchaser Class. This duty arose for multiple, independent reasons. First, Defendants actively concealed the policy's defects by placing a product with illegal terms into the stream of commerce under the guise of a legally compliant one, thereby creating a misleading appearance of legitimacy. Additionally, Defendants, as sophisticated insurers, had superior and exclusive knowledge of the policy's material illegalities, a fact that was not reasonably discoverable by consumers. This information asymmetry created a duty to disclose these material facts to Lyft's customers who were funding the policy.

174. Defendants intentionally concealed and failed to disclose material facts to the Class at the point of sale, including, without limitation: (a) that the UM/UIM policy contained an illegal "excess" clause in direct violation of the primacy mandate of Public Utilities Code § 5433; (b) that the illegal policy terms were therefore void as against public policy and provided an unenforceable promise of security; and (c) that Defendants had a uniform practice of administering claims pursuant to these illegal provisions.

175. Defendants knew their policy provisions were illegal or acted with reckless disregard for the illegality of these provisions. They concealed these material facts with the intent to defraud and induce reliance from Plaintiffs and the Class, knowing that the members of the Class would not agree to pay the premium component of their fares if the true, unlawful nature of the insurance provisions were disclosed.

176. Plaintiffs and the Class justifiably relied on Defendants' material omissions. Their reliance is established by the presumption that in the absence of contrary information, a mandatory, regulated product sold by a major corporation is legally compliant. The materiality of the omitted information is so significant that reliance can be presumed on a class-wide basis. Had the truth been disclosed, Plaintiffs and the Class would have paid less for the legally deficient insurance.

177. As a direct and proximate result of their reliance on Defendants' concealment,

Plaintiffs and the Class were harmed. They suffered direct economic damages in the form of the money they paid for a significantly devalued insurance product with illegal and unenforceable provisions, in an amount to be proven at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of the Class and Subclass, respectfully requests the following relief:

- An order certifying this matter as a class action with Plaintiffs as Class Representatives, and designating Plaintiffs' counsel as Class Counsel;
- A judicial declaration that:
    i. Pursuant to California Public Utilities Code § 5433(b) as written and enforced prior to January 1, 2026, the UM/UIM coverage provided under Defendants' TNC insurance policy is primary, and any policy provision purporting to render this coverage "excess" or "secondary," including but not limited to the limit-reduction clause in Section (D)(4) of the policy endorsement, is void *ab initio* and unenforceable;
    ii. Defendants' practice of requiring an insured to first seek and obtain a denial of coverage from a personal automobile insurance policy before Defendant will investigate, evaluate, or pay UM/UIM benefits, constitutes the imposition of an unlawful precondition to coverage. It should be further declared that this practice violates the primacy mandate of Public Utilities Code § 5433(b) and the express prohibition against such preconditions in Public Utilities Code § 5433(d), and is therefore unenforceable.
    iii. Defendants have an immediate and independent duty under California law to promptly investigate and pay all undisputed benefits owed under the policy, which is not delayed or excused by the existence of any other insurance; and
    iv. Pursuant to Public Utilities Code § 5443, the duties and obligations set forth in the TNC insurance article are exclusive and controlling, and Defendants are

statutorily prohibited from relying on any other policy of insurance or any other law to render its mandatory UM/UIM coverage secondary or excess.

- On behalf of the California Purchaser Class under the UCL, for an order:
  - i. Requiring Defendants to make full restitution of all money wrongfully acquired from the Class and complete disgorgement of all fees, surcharges, profits, interest, and other consideration paid by Plaintiffs and the Class Members for the non-compliant and unlawful insurance terms;
  - ii. Imposing a constructive trust over all wrongfully acquired funds for the benefit of the Class; and
  - iii. Permanently enjoining Defendants from continuing the unlawful, unfair, and fraudulent practices alleged herein.
- An award of compensatory damages;
- An award of punitive and exemplary damages;
- Costs of suit;
- An award of all available attorneys' fees, pursuant to, *inter alia*, the common fund doctrine;
- Pre-judgment and post-judgment interest on monetary relief; and
- All other and further relief as the Court deems necessary, just, and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs, individually and on behalf of the Class, demand a jury trial on all issues so triable.

Dated: March 13, 2026

Respectfully submitted,

**MADAR LAW CORPORATION**

By: /s/ Alex S. Madar

Alex S. Madar, Esq. (SBN: 319745)
*alex@madarlaw.net*
**MADAR LAW CORPORATION**
630 1st Ave, STE 219
San Diego, CA 92101
Telephone: (858) 299-5879

Andrea R. Gold (*admitted pro hac vice*)
*agold@tzlegal.com*
**TYCKO & ZAVAREEI LLP**
2000 Pennsylvania Avenue, Northwest, Suite 1010
Washington, District of Columbia 20006
Telephone: (202) 973-0900

Frank A. Bartela (*admitted pro hac vice*)
*fbartela@tzlegal.com*
Patrick J. Brickman (*admitted pro hac vice*)
*pbrickman@tzlegal.com*
**TYCKO & ZAVAREEI LLP**
2515 Jay Ave, Ste First Floor
Cleveland, OH 44113
Telephone: (216) 423-6599

Michael A. VanGalio, Esq.
*michael@vangaliolaw.com*
**VANGALIO LAW CORP**
4203 Genessee Ave. Ste 103 Box 163
San Diego, CA 92117
Telephone: (805) 720-3938
*Attorneys for Plaintiffs and the Proposed Classes*